# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ARNOLD ROTH, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 11-1377 (RCL) |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiffs have brought claims pursuant to the Foreign Sovereign Immunities Act ("FSIA") against the Islamic Republic of Iran and the Iranian Ministry of Information and Security ("MOIS"). They seek damages for injuries suffered as a result of a terrorist attack committed in Jerusalem, Israel on August 9, 2001. Pending before the Court is plaintiffs' motion for default judgment. ECF Nos. 25, 34. For the reasons that follow, the Court concludes that plaintiffs' motion will be **GRANTED IN PART** and **DENIED IN PART**.

## I. PROCEDURAL HISTORY

Plaintiffs filed their complaint on July 28, 2011, pleading causes of action against Iran and MOIS. Compl., ECF No. 3.[1] Their causes of action and the jurisdiction of this Court are premised on section 1605A of the FSIA. Iran and MOIS were served with process on September 16, 2012. ECF No. 19. Their answer was due November 15, 2012. Defendants made no

---

[1] Plaintiffs' complaint also pleads causes of action against the Syrian Arab Republic and Syrian Air Force Intelligence ("SAFI"). To this point, plaintiffs have been unable to complete service of process on these two Syrian defendants. Because plaintiffs' claims against the Iranian defendants are ripe for consideration on the merits and in the interest of bringing an expeditious conclusion to this litigation, the Court severed plaintiffs' claims against Syria and SAFI on November 19, 2014. ECF No. 35. Those claims now form the basis of a separate suit before this Court, *Roth v. Syrian Arab Republic*, Civil Action No. 14-1946 (RCL). All references to "defendants" in this opinion refer only to Iran and MOIS.

response and have yet to appear in this case.  The Clerk of the Court entered default against defendants on April 21, 2014.  ECF No. 24.  Plaintiffs have now moved for entry of default judgment against defendants, both as to liability and damages.  Pl.'s Mot. Entry of Default J. as to Liability, ECF No. 25; Pl.'s Mot. Entry of Default J. and Mem. of Law in Support of Claim for Damages, ECF No. 34 (hereinafter "Pl.'s Mot. Def. J. and Damages Mem.").

## II.  FINDINGS OF FACT

Before determining whether defendants should have a default judgment entered against them, the Court must consider evidence and make findings of fact with respect to plaintiffs' allegations.  This is because section 1608(e) of the FSIA requires that no default judgment shall be entered against a foreign state or its political subdivision except upon "evidence satisfactory to the court."  28 U.S.C. § 1608(e).  The Court, therefore, may not "simply accept a complaint's unsupported allegations as true."  *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010).  Courts may rely on uncontroverted factual allegations that are supported by affidavits.  *Id.*  Also, courts may take judicial notice of prior related proceedings in cases before the same court.  *Id.*  Before the Court sets out its findings of fact, the basis for accepting this latter form of evidence warrants greater elaboration.

### A.  Judicial Notice of Prior, Related FSIA Cases

A court may "take judicial notice of, and give effect to, its own records in another but interrelated proceeding."  *Opati v. Republic of Sudan*, ---F. Supp. 2d---, Civil Action No. 12-1224 (JDB), 2014 WL 3687125, at *2 (D.D.C. July 25, 2014) (quoting *Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938)).  This is in keeping with Federal Rule of Evidence 201(b), which allows a court to "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably

be questioned." Fed. R. Evid. 201(b).  In light of this authority and the numerous FSIA cases in recent years giving rise to nearly identical factual and legal issues, this Court and others in this District have frequently taken judicial notice of earlier, related cases arising under the state-sponsored terrorism exception to foreign sovereign immunity.  *See, e.g.*, *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 115 (D.D.C. 2012) (citing cases).

The Court may not simply adopt previous factual findings without scrutiny however. This is because factual findings "represent merely a court's probabilistic determination as to what happened, rather than a first-hand account of the actual events." *Id.* at 116.  As such, courts have concluded that findings of fact are generally considered hearsay, not subject to an enumerated exception to the prohibition on hearsay evidence in the federal rules.  *Rimkus*, 750 F. Supp. 2d at 172.  This does not mean, however, that courts in later, related FSIA proceedings are given the "onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack."  *Id.*  Instead, courts adjudicating related FSIA cases may "rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them." *Id.*  As stated above, the records of this Court in related proceedings are not subject to reasonable dispute.  *See Opati*, 2014 WL 3687125, at *2.  Thus, the type and substance of evidence previously presented to this Court in prior proceedings may be judicially noticed in the process of reaching findings of fact in this case.

On May 19, 2006, the Court presided over a hearing on liability in the case of *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 95 (D.D.C. 2006).  There the Court received evidence regarding the August 9, 2001 attack upon which this suit is also based.  *Id.* at 94–95.  The Court shall take judicial notice of that evidence in making its findings of fact.  The

Court shall also take judicial notice of evidence received in *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003) (Urbina, J.) and *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003), both cases involving Iran and MOIS's liability for state sponsorship of terrorism.

### B.  The Attack

On August 9, 2001, an unremarkable day in Jerusalem was rendered tragically memorable when Izz al-Din Shuheil Ahmed Masri detonated a ten-pound bomb at a Sbarro restaurant.  Pl.'s Ex. List, Ex. 16, U.S. Dep't of State, *Patterns of Global Terrorism 2001* at 54, 80 (2002), *Greenbaum v. Islamic Republic of* Iran, Civil Action No. 02-2148 (RCL) (D.D.C. May 18, 2006), ECF No. 27-9 (hereinafter "*Patterns of Global Terrorism*"); Pl.'s Supplemental Ex. List, Ex. 18, Catalog/Translation of Evidence, *Greenbaum*, Civil Action No. 02-2148 (RCL), ECF No. 28-6 at 1–2.[2]  The resulting explosion killed 15 people, including plaintiff Malka Roth. *Patterns of Global Terrorism* at 80.

Shortly afterwards, it became clear that Hamas was ultimately responsible for the attack.[3] *Patterns of Global Terrorism* at 54; Patrick Clawson Dep. 18:2–8, May 24, 2006, *Greenbaum*, Civil Action No. 02-2148 (RCL), ECF No. 28-2 (hereinafter "Clawson Dep.").  This conclusion was supported by the following factors:

> [A] living will videotape of the bomber made by the bomber beforehand in which he describes himself as being a member of Hamas and says he's going to carry out a suicide bombing; the description after the bombing by the bomber's father of his son as being a member of Hamas; and, furthermore, the court evidence and the interviews with the two individuals who were subsequently arrested for having helped the bomber identify the target and get him to the target in which they describe themselves as members of Hamas . . . .

---

[2] This source is an English translation of an Israeli police file relevant to the August 9 attack.  The translation was made by an individual employed by the Washington Institute for Near East Policy.

[3] Hamas is described by the State Department as an "outgrowth of the Palestinian branch of the Muslim Brotherhood" that uses "both political and violent means, including terrorism, to pursue the goal of establishing an Islamic Palestinian state in place of Israel." *Patterns of Global Terrorism* at 93.

Clawson Dep. 18:8–19:1.[4]

## C.  Defendants' Actions and Involvement in the Attack

The State Department has broadly concluded that Iran provided Hamas and other "Palestinian rejectionist groups" with "varying amounts of funding, safehaven, training, and weapons," prior to and during the year 2001.  *Patterns of Global Terrorism* at 65.  It has also concluded that Iran "encouraged Hizballah and the rejectionist Palestinian groups to coordinate their planning and to escalate their activities."  *Id.*

Deposition testimony from Dr. Clawson, before the Court in *Greenbaum*, supported these conclusions.  He stated that in the fall of 2000, "Iranian support for Hamas was at fever pitch." Clawson Dep. 27:14–18.  He asserted that "Iran's support for Hamas in 2000 and 2001 was at least several million dollars a year, if not more."  *Id.* 33:2–4.

MOIS is the Iranian intelligence service.  *Id.* 24:20.  Evidence in prior cases has established that MOIS played a role in providing Iranian support to Hamas during the period preceding the August 9, 2001 attack.  *Id.* 23:14–17; *see also Campuzano*, 281 F. Supp. 2d at 262 (citing evidence showing that Iran routes its financial support for Hamas through MOIS and that a component organization of MOIS provides training to Hamas operatives).  Dr. Clawson, for example, cited a Canadian government document indicating that in February 1999 a transfer of $35,000,000 was made to Hamas by MOIS.  Clawson Dep. 24:14–22.  This money was "reportedly meant to finance terrorist activities against Israeli targets."  *Id.*

---

[4] Patrick Clawson, Ph.D., was, at the time of his deposition in *Greenbaum*, the Deputy Director for Research at the Washington Institute for Near East Policy.  Clawson Dep. 4:14–15.  He is now the Director of Research at that organization, according to its website.  *Our Experts: Leadership*, Washington Institute for Near East Policy, http://www.washingtoninstitute.org/experts/view/clawson-patrick (last visited Jan. 21, 2015).  He has previously provided expert testimony to this Court and others of this District regarding Iranian support for terrorism and for Hamas specifically.  *See Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 238 (D.D.C. 2012); *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 253 (D.D.C. 2006); *Ben- Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 44 n.3 (D.D.C. 2008) (citing cases).  The Court once again shall treat Dr. Clawson as an expert on Iran, its government, and its support for terrorism.

The Court has also been presented with substantial evidence that MOIS support for terrorism and Hamas's engagement in it was approved at the highest level of Iran's government. In *Peterson*, this Court reviewed evidence indicating that at the time of the Beirut U.S. Marine barracks bombing in 1983, Iranian approval of terrorist attacks would have involved a discussion in the National Security Council—including the prime minister—and would have required the approval of the supreme religious leader, the ayatollah. *Peterson*, 264 F. Supp. 2d at 53.   In *Campuzano*, Judge Urbina discussed evidence showing that at the time of a 1997 Hamas suicide bombing, MOIS and Iranian support for Hamas would have required senior leadership approval. *Campuzano*, 281 F. Supp. 2d at 262.   Similarly, the State Department has stated that Iran, during 2001, encouraged Hamas and other organizations to "escalate their activities."   *Patterns of Global Terrorism* at 65.   That year, Ayatollah Khamenei continued to state his view that Israel is a "cancerous tumor" requiring removal, vividly illustrating the sort of hostility underlying Iran's support for Hamas.   *Id.*   Such hostility—and material support to Hamas in furtherance thereof— appears to have been, in effect, the official state policy of Iran at the time of the August 9, 2001 attack.

### D.  Plaintiffs' Status and Injuries

The Court now makes findings regarding each plaintiff, including the injuries they suffered as a result of the August 9, 2001 attack and their citizenship (as is relevant to their entitlement to recover under section 1605A of the FSIA).

### 1.  Malka Roth

Plaintiff Malka Roth was killed in the August 9, 2001 attack.   Arnold Roth Decl. ¶ 2, ECF No. 34-2.   She was 15 years old.   *Id.* ¶ 3.   She is represented in this litigation by her parents, Arnold and Frimet Roth, who serve as co-administrators of her estate.   Compl., ECF No. 3; Pl.'s

Supp. Mem. Ex. A, ECF No. 42-1.  Malka Roth was a United States citizen.  Arnold Roth Decl. ¶ 3.

### 2.  Immediate family of Malka Roth

The other plaintiffs in this case are all immediate family members of Malka Roth. Arnold and Frimet Roth are her parents and Pesia Roth, Rivka Roth Rappaport, Zvi Roth, Shaya Roth, Pinchas Roth, and Elisheva Roth are her siblings.  All except Arnold Roth are United States citizens.[5] [6]  All reside in Jerusalem, Israel.  Arnold Roth Decl. ¶ 6.

Each plaintiff has alleged emotional injuries resulting from Malka Roth's death.  These injuries are detailed below.

#### a.  Frimet Roth

Frimet Roth first heard of the bombing a few minutes after it occurred through a CNN news report.  Frimet Roth Decl. ¶ 8.  She was immediately concerned for the safety of three of her children who were out on the streets of Jerusalem.  *Id.*  While two returned home a half hour later unharmed, Malka did not appear and did not respond to repeated phone calls.  *Id.*  Later in the day, Frimet set out for Shaarei Zedek Medical Center to search for her daughter, accompanied by the mother of Malka's best friend, who had been with Malka that day.  *Id.* During the journey, Frimet learned that Malka's friend had sent a text message shortly before the bombing stating that the two girls were going to Sbarro.  *Id.*  At that point, Frimet stated, she "knew that the worst had happened and broke down banging on the car window and crying."  *Id.* After returning home, she waited with her family and some neighbors, "moaning uncontrollably"

---

[5] Arnold Roth Decl. ¶¶ 2, 5, 26; Frimet Roth Decl. ¶¶ 3, 7, ECF No. 34-3; Rivka Roth Rappaport Decl. ¶¶ 2, 4, ECF No. 34-6; Zvi Roth Decl. ¶¶ 2, 4, ECF No. 34-7; Shaya Roth Decl. ¶¶ 2, 4, ECF No. 34-8; Pinchas Roth Decl. ¶¶ 2, 4, ECF No. 34-9; Pesia Roth Decl. ¶¶ 2, 4, ECF No. 34-10.

[6] Arnold Roth has filed a notice of voluntary dismissal without prejudice as to his claims pled in his individual capacity.  ECF No. 41.  Because defendants have not filed an answer or a motion for summary judgment, Arnold Roth's claims were dismissed without prejudice upon filing of this notice. Fed. R. Civ. P. 41(a)(1)(A)(i).  His claims made in his capacity as representative of Malka Roth's estate are still pending.

while waiting for news. *Id.* Finally, around 2 a.m. the following morning, her sons Pinchas and Shaya called from the government's pathology lab. *Id.* ¶¶ 8, 9. Arnold took the call; Frimet recounted that just by reading his reaction, she knew that Malka's death had been confirmed. *Id.* ¶ 9. Frimet now mournfully recalls this moment as a cruel culmination with indelible effects: "The trauma of the evening and night leading up to that moment and then of the hours immediately after are impossible for me to describe. They will never leave me. They changed my life forever." *Id.*

Frimet states that her pain at Malka's death "has never left [her] for a moment." *Id.* ¶ 10. Indeed, because the mere memory of her daughter triggers such powerful sadness, she willfully suppresses her memories of Malka "in order to function, to plod ahead with life." *Id.* ¶ 11. Nonetheless, her declaration affirms her powerful love for Malka, detailing her admiration and gratitude for Malka's many positive qualities, including Malka's ardent devotion to her disabled sister Elisheva. *Id.* ¶¶ 12–16.

### b. Rivka Roth Rappaport

Rivka Roth Rappaport is Malka Roth's sister, three and a half years Malka's junior. Rivka Roth Rappaport Decl. ¶ 3. Rivka states that she and Malka were "very close" growing up. *Id.* ¶ 7. Indeed, during that time they shared a bedroom and attended the same school and youth group. *Id.* Rivka remembers the day and night spent waiting for news of Malka's fate as traumatic; she recalls crying and being distraught at the news Malka's best friend had been killed. *Id.* ¶ 14 (characterizing the night's uncertainty as "excruciating"). She knew Malka had died when she awoke to hear her mother "wailing and moaning" at the news. *Id.* ¶ 15.

Rivka declares that she has experienced emotional trauma and physical pain from her sister's death. *Id.* ¶ 16. She visited a psychologist once or twice but did not go regularly because

of her skepticism of therapy at the time.  *Id.*  She now regrets that decision.  *Id.*  Rivka states that her life will never be the same as a result of the attack.  *Id.* ¶ 17.

### c. Zvi Roth

Zvi Roth is Malka Roth's brother, born two and a half years before her.  Zvi Roth Decl. ¶¶ 2–3.  He states that he and Malka were "very close" growing up.  *Id.* ¶ 7.  They spent a great deal of time together, doing things like playing together and going to the swimming pool.  *Id.*  Like his sister Rivka, Zvi recalls the night waiting for news about Malka after the attack as being "very difficult."  *Id.* ¶ 13.  Upon hearing of his sister's death, he felt "terribly exhausted" and like "everything in my life was collapsing."  *Id.* ¶ 14.

Zvi states that he has suffered emotional trauma and physical pain as a result of Malka's death.  *Id.* ¶ 15.  In the aftermath, he had trouble "studying and socializing" and felt isolated by his experience and his grief.  *Id.*  He "received grief counseling from both a psychologist and from a social worker."  *Id.*  He states that his life will never be the same without Malka and that he misses her and regrets that his memories of her are fading from clarity.  *Id.* ¶¶ 8, 16.

### d. Shaya Roth

Shaya Roth is Malka Roth's brother.  Shaya Roth Decl.  ¶ 2.  He is four and a half years older than her.  *Id.* ¶ 3.  Shaya declares that he and Malka were very close as young children but that they grew apart somewhat as teenagers because of the busy schedule and expanding social life that attends adolescence.  *Id.* ¶ 7.  Nonetheless, Shaya recounts anecdotes of his relationship with Malka from the summer of 2001 that demonstrate the continued affection the two shared for one another up until her death.  *Id.* ¶ 11 (describing a "refreshing and enjoyable" hike they took together that is one of Shaya's favorite memories of his sister); *id.* ¶ 12 (recalling that a couple of days before her death, Malka gave Shaya a shopping bag full of snacks to take with him in

anticipation of his enlistment in the army, a gesture that "moved" Shaya so much that he kept the snacks for months after her death, unable to eat or discard them).

Shaya, along with his older brother Pinchas, traveled to the Israeli government pathology center at Abu Kabir in the morning following the attack at 2 a.m. *Id.* ¶ 15. They went to determine whether a body at the center potentially matching Malka's description was indeed their sister. *Id.* Shaya's declaration vividly describes the events that followed:

> I will never forget my wandering thoughts on the long drive to Abu Kabir; my deliberation while looking at her body lying on the clinic's bed, knowing it was her but hesitating to declare it and making it official and all the while having a glimmer of doubt or hope that I may be making a mistake and that Malka is alive somewhere; the call home to say I had found her body – talking to my father and hearing my mother crying in the background; and then the long drive home in silence.

*Id.*

Like his siblings, Shaya states that he has suffered emotional trauma and physical pain as a result of Malka's death. *Id.* ¶ 16. In particular, Shaya highlighted the difficulty of being a new soldier in the wake of the attack, with his only relief from the rigors of military life being emotionally difficult weekends on leave at home with a family now "severely limited" in its ability to "function healthily as a supportive and constructive force" in his life. *Id.* ¶¶ 8, 16. He affirms that he misses Malka, that he regrets that she will not be a presence in the lives of his family, and that he believes his life will never be the same without her. *Id.* ¶ 17.

### e. Pinchas Roth

Pinchas Roth is Malka Roth's brother and is seven and a half years older than her. Pinchas Roth Decl. ¶ 3. Pinchas states that, like the other plaintiffs, he spent the time immediately following the attack "frantically trying to find some information about where [Malka] might be." *Id.* ¶ 8. He was given the difficult task, along with his brother Shaya, of

identifying Malka's body shortly thereafter. *Id.* ¶ 9.  Pinchas states that he experienced emotional trauma and physical pain because of Malka's death. *Id.* ¶ 10.  He recalls that the attack resulted in his having "trouble moving around in public places among strangers, for fear that one of them might be carrying a bomb." *Id.*  He participated in individual and group therapy for several years. *Id.*  Pinchas declares that he misses talking to his sister and sharing stories with her; he believes his life will never be the same without her. *Id.* ¶ 11.

### f. Pesia Roth

Pesia Roth is Malka Roth's sister and is seven years younger than Malka.  Pesia Roth Decl. ¶¶ 2–3.  Despite their age gap, Pesia states that she and Malka were "very close." *Id.* ¶ 7. They would "sing and play music together, have deep and meaningful conversations (despite our age gap she would talk to me at eye level), play cards, [and] go swimming." *Id.*  Pesia viewed Malka as an "incredible big sister," a person who was "very precious" to her. *Id.*

Like many members of her family, Pesia states that she was distraught while waiting for news about Malka, crying as she waited. *Id.* ¶ 13.  She states that she experienced emotional trauma and physical pain as a result of Malka's death. *Id.* ¶ 15.  She received counseling as treatment for this trauma, including from professional psychologists. *Id.*  Pesia believes that her life will never be the same without Malka. *Id.* ¶ 16.

### g. Elisheva Roth

Elisheva Roth is Malka Roth's sister and is roughly nine years younger than Malka. Arnold Roth Decl. ¶ 27.  Elisheva is profoundly mentally disabled, blind, and afflicted by a "pervasive and aggressive seizure condition."[7]  *Id.* ¶¶ 28–29.  Her only communication with the

---

[7] Elisheva is represented in this litigation by her parents as her "parents, friends, and next of kin."  The Court construes this statement as indicating that they represent her as "next friend" because she is incompetent, in accordance with Federal Rule of Civil Procedure 17(c).  The Court shall discuss their capacity to represent her in this way in part III.C.1.*d* of its opinion.

world outside her mind comes by subtle movements of her index finger, indicating yes or no.  *Id.*

As a result, the Court relies on declarations of other members of the family in detailing Malka

and Elisheva's relationship.  Malka was, according to her parents, devoted to her sister Elisheva.

*Id.* ¶ 29; Frimet Roth Decl. ¶ 13 ("Her devotion to her disabled sister [Elisheva] was beyond all

our expectations.  She was simply drawn to [Elisheva] – as she was to other children with

disabilities – and, of her own volition, helped me care for [Elisheva] at every turn.").  The record

does not, however, contain any information regarding the emotional impact that Malka's death

may have had on Elisheva.

## III.  CONCLUSIONS OF LAW

### A.  Jurisdiction and Sovereign Immunity

The FSIA is the "sole basis for obtaining jurisdiction over a foreign state in our courts."

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).  The statute

codifies the concept of foreign sovereign immunity, something which is "a matter of grace and

comity on the part of the United States, and not a restriction imposed by the Constitution."

*Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2255 (2014) (quoting *Verlinden*

*B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983)).  The FSIA sets forth exceptions to

foreign sovereign immunity that provide the only authority for a district court to assert subject

matter jurisdiction over claims against a foreign state.  *Odhiambo v. Republic of Kenya*, 764 F.3d

31, 34 (D.C. Cir. 2014).  "[I]f no exception applies, the district court has no jurisdiction."  *Id.*

Because subject matter jurisdiction is premised on the existence of an exception to

foreign sovereign immunity, a district court considering a claim against a foreign state must

decide whether an exception to immunity applies "even if the foreign state does not enter an

appearance to assert an immunity defense."  *Verlinden*, 461 U.S. at 493 n.20.  This is in keeping

with the general rule that "[s]ubject-matter jurisdiction can never be waived or forfeited;" thus, when jurisdictional questions arise in a suit, "courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented." *Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012).

### 1.  Original jurisdiction

Federal district courts have original jurisdiction over FSIA cases by virtue of 28 U.S.C. § 1330.  It provides that original jurisdiction will exist over (1) nonjury civil actions (2) for claims seeking relief *in personam* (3) against a foreign state (4) when the foreign state is not entitled to immunity either under sections 1605 to 1607 of the FSIA or under any applicable international agreement.  28 U.S.C. § 1330(a).  Section 1604 of the FSIA reinforces element four, stating that foreign states are presumptively immune from jurisdiction in federal and state courts except to the extent provided in sections 1605 to 1607.  28 U.S.C. § 1604.

All of section 1330(a)'s requirements are met in this case.  First, plaintiffs have not demanded a jury trial.  This is, therefore, a nonjury civil action.  Second, this suit is against defendants as legal persons, not against property.  The claims, therefore, seek relief *in personam*. *Cf. Gang Luan v. United States*, 722 F.3d 388, 399 n.15 (D.C. Cir. 2013) ("*In personam* jurisdiction is jurisdiction over the defendant.  *In rem* jurisdiction is jurisdiction over the property.").

Third, this suit is against a "foreign state."  One defendant, Iran, is plainly a foreign state. The status of MOIS requires greater consideration.  The FSIA defines a foreign state at section 1603(a) as including "a political subdivision of a foreign state."  28 U.S.C. § 1603(a).  The D.C. Circuit has adopted a "categorical approach" to determining the legal status of foreign government-related entities for purposes of the FSIA's jurisdiction and service of process

provisions: "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003). This Court has previously concluded that MOIS is the intelligence organization of Iran and is a conduit of Iranian funds to terrorist organizations. *Peterson*, 264 F. Supp. 2d at 53; *see also Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 7 (D.D.C. 2010). Intelligence gathering and operations are not commercial in nature; they are governmental functions. MOIS, thus, may be treated as itself a "foreign state" for purposes of section 1603(a). *See Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 51 (D.D.C. 2012) (finding that MOIS was a foreign state for purposes of those proceedings because the evidence established it was a "division of the state" itself).

### a. Sovereign immunity

The final requirement for jurisdiction under section 1330(a)—that there be an exception to sovereign immunity as to the defendants—requires more substantial explanation. The exception to foreign sovereign immunity relevant to this suit is codified at 28 U.S.C. § 1605A, the state-sponsored terrorism exception. That section establishes that a foreign state has no immunity

> [I]n any case . . . [1] in which money damages are sought [2] against a foreign state [3] for personal injury or death that was [4] caused by [5] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A (numbering added). The Court now considers each of these requirements for waiver of sovereign immunity.

First, the complaint identifies and seeks only monetary remedies for plaintiffs' injuries. Second, as established above, both defendants are foreign states as defined by the statute. Third,

plaintiffs have proven various instances of personal injury or death and all claims arise from these instances.  Under section 1605A, such injury or death "must merely be the bases of a claim for which money damages are sought."  *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010).  Jurisdiction is not restricted to physical injury suffered directly by each claimant.  *Id.*  Thus, plaintiffs' various claims for emotional injuries to Malka's family and economic losses to her estate, all of which spring from Malka's death in the bombing, constitute the type of claims required for jurisdiction.

The fourth element, causation, is established by showing "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered." *Id.* (internal citation omitted).  Plaintiffs need not show that their injuries would not have occurred "but for" defendants' actions.  *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (interpreting the similarly worded causation requirement of the former state-sponsored terrorism exception to foreign sovereign immunity, section 1605(a)(7), as requiring only "proximate cause").

Plaintiffs have sufficiently demonstrated a "reasonable connection" between defendants' acts and their damages.  The facts found by the Court demonstrate that defendants (1) provided substantial support to Hamas through provision of money and training and (2) encouraged the escalation of terrorist activities, including against Israeli targets.  These acts have a reasonable connection to the attack ultimately carried out by Hamas on August 9, 2001.  This is sufficient for the relatively low proximate cause bar imposed by the FSIA.

Finally, plaintiffs' claims must arise out of "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).  This act or provision of material support must be engaged in by an

officer, employee, or agent of the foreign state within the scope of the actor's office, employment, or agency. *Id.*

In this context, provision of material support or resources has the same meaning as it is given in section 2339A of Title 18 of the U.S. Code.   28 U.S.C. § 1605A(h)(3).   That section defines "material support or resources" as

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

Extrajudicial killing has the same meaning as it is given in section 3 of the Torture Victim Protection Act of 1991.   28 U.S.C. § 1605A(h)(7).   That section defines extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples."   *See* Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (excluding from the definition killings that are lawful under international law).

The August 9, 2001 bombing caused the deaths of innocent civilians, including Malka Roth.   Those individuals were killed not according to the judgment of a regularly constituted court but instead the malicious design of the terrorists who carried out the attack.   The bombing was an "extrajudicial killing" as defined by the FSIA.   Defendants provided "material support or resources" for this act by their provision of money and training to Hamas and its members.   Finally, this provision of material support or resources was within the scope of the provider's office, employment, or agency.   As set forth above, MOIS, treated as the foreign state itself, was the primary conduit for the provision of funds and training to Hamas and other terrorist

organizations.   MOIS' provision of support to Hamas would have required the approval of officials at the highest level of Iran's government.

Thus, the final element for waiver of sovereign immunity under section 1605A is met and defendants are not entitled to sovereign immunity.  Because all of section 1330(a)'s requirements for jurisdiction are satisfied, the Court possesses original jurisdiction over this matter.

### 2.  Requirements for a claim to be heard

Section 1605A only applies if three conditions are met: (1) the foreign state was designated a state sponsor of terrorism at the time of the act giving rise to liability or was so designated in response to such act and remains so designated, (2) the claimant or victim was a national of the United States at the time of the act waiving sovereign immunity[8], and (3) in cases where the act occurred in the foreign state against whom suit has been brought, the foreign state was afforded a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration.  28 U.S.C. § 1605A(a)(2).  Each of these conditions is met here.

First, Iran was designated by Secretary of State George P. Shultz on January 23, 1984, in accordance with the Export Administration Act of 1979, as a "country which has repeatedly provided support for acts of international terrorism."  49 Fed. Reg. 2836-02 (Jan. 23, 1984) (statement of Secretary of State George P. Shultz).  This designation meets section 1605A's definition of "state sponsor of terrorism."  28 U.S.C. § 1605A(h)(6).  Iran continues to be designated as a state sponsor of terrorism to this day.  *State Sponsors of Terrorism*, U.S. Dep't of State, http://www.state.gov/j/ct/list/c14151.htm (last visited Jan. 21, 2015).  Because Iran was a designated state sponsor of terror at the time of the incident underlying plaintiffs' claims and because it continues to be so designated, the first condition for a claim to be heard is met.

---

[8] Two other categories of claimants or victims that would meet section 1605A's requirements are not relevant here.

Plaintiffs meet the second requirement because all claimants or victims are nationals of the United States. Malka Roth and all members of her family that bring claims on their own behalf are citizens of the United States. Finally, plaintiffs have met the third requirement because the "act" described in subsection (a)(1)—i.e. the act of extrajudicial killing—occurred in Israel, not the defendant state. Thus, plaintiffs were not required by statute to afford defendants a reasonable opportunity to arbitrate.

### 3. Personal jurisdiction

Federal courts have personal jurisdiction over a foreign state if (1) the court has jurisdiction pursuant to section 1330(a) and (2) service has been properly made under section 1608 of the FSIA. 28 U.S.C. § 1330(b). As established above, the requirements for jurisdiction under section 1330(a) are met in this case. The Court next proceeds to an analysis of section 1608's requirements for service.

Section 1608(a) requires that service upon a foreign state or a political subdivision of a foreign state—such as MOIS—be completed in one of four ways. 28 U.S.C. § 1608(a). The methods are presented in order of preference; a method of service must be unavailable or unsuccessful for a party to attempt service under a later method. *Id.* The first three methods are: (1) delivery of a copy of the summons and complaint in accordance with any special arrangement for service between plaintiff and the foreign state, (2) delivery of the same documents in accordance with an applicable international convention on service of judicial documents, or (3) delivery of the same documents as well as a notice of suit, all translated into the foreign state's official language, by mail, return receipt requested. 28 U.S.C. § 1608(a)(1–3). The Court is not aware of any special arrangement for service between these parties and no international convention on service applies. Plaintiffs were thus authorized to attempt service

under subsection 3.   Their attempt was unsuccessful; defendants returned the documents unexecuted a few weeks after their mailing.  ECF No. 12.

Therefore, plaintiffs were authorized to effect service under section 1608(a)(4).   That provision authorizes service

> [B]y sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a)(4).   The Clerk of the Court certified mailing the specified documents, translated as required, to the State Department on May 8, 2012.  ECF No. 16.   The State Department subsequently confirmed transmission of the documents to the Iranian Ministry of Foreign Affairs by way of the Foreign Interests Section of the Embassy of Switzerland in Tehran, Iran.   ECF No. 19.   Certified copies of the diplomatic notes showing the date of transmission—September 16, 2012—were attached thereto.   *Id.*   In light of these filings, the Court concludes that plaintiffs have complied with section 1608(a)(4) and have, therefore, properly served defendants in accordance with the FSIA.   The Court may exercise personal jurisdiction over defendants.[9]

### B.  Timeliness

Section 1605A includes a limitations provision, at subsection (b), setting out a series of time periods within which an action under the section "may be brought or maintained."   28

---

[9] The Court also notes that no minimum contacts threshold must be met as to the defendants, either as a matter of constitutional or customary international law.  *See Valore*, 700 F. Supp. 2d at 70–71 (concluding that neither Iran nor MOIS, as foreign states, were protected by the Fifth Amendment's Due Process Clause and that customary international law did not come into play because it cannot prevail over a contrary federal statute).   Satisfaction of section 1330(b) is all that is required for assertion of personal jurisdiction over defendants.

U.S.C. § 1605A(b).   This Court has held that section 1605A's limitations provision is not jurisdictional.   *See Worley v. Islamic Republic of Iran*, ---F. Supp. 3d---, Civil Action No. 12-2069 (RCL), 2014 WL 6879852, *10–*12 (D.D.C. Dec. 8, 2014).   Nonetheless, the Court shall briefly explore the matter because it concludes that plaintiffs have complied with the statute of limitations.

Section 1605A(b) provides that an action may be brought "10 years after the date on which the cause of action arose."   28 U.S.C. § 1605A(b)(2).   The attack giving rise to this action occurred on August 9, 2001.   Plaintiffs' cause of action arose on that date.   *Cf. Amobi v. District of Columbia Dep't of Corr.*, 755 F.3d 980, 994 (D.C. Cir. 2014) (internal citation omitted) (holding that under District of Columbia law, the statute of limitations usually begins running when a plaintiff "sustains a tortious injury").   Plaintiffs filed their complaint on July 28, 2011, less than 10 years from the date their cause of action arose.   Their claims are timely under section 1605A of the FSIA.

### C.  FSIA Liability

The state-sponsored terrorism exception provides a private right of action.   The action is available to, among others, nationals of the United States and the legal representatives of such persons.   28 U.S.C. § 1605A(c).   Foreign states that meet subsection (a)(2)(A)(i)'s requirements as state sponsors of terrorism may be held liable under subsection (c).   *Id.*

Section 1605A's private right of action has four basic elements.   A plaintiff must prove: (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where (2) the act was committed, or the material support was provided, by the foreign state or agent of the foreign state, and the act (3) caused

personal injury or death (4) "for which courts of the United States may maintain jurisdiction under this section for money damages." *Id.* § 1605A (a)(1), (c).

### 1. Threshold determination of plaintiffs' and defendants' statuses

The Court first determines whether the parties are such that subsection (c)'s cause of action may be pursued.

#### a. Defendants are state sponsors of terrorism

Defendants, for the reasons stated above in Part III.A.2, are state sponsors of terrorism within the meaning of section (a)(2)(A)(i) and may be held liable.

#### b. Entitlement of plaintiffs to bring section 1605A(c) action

All of the plaintiffs may pursue section 1605A(c)'s private right of action.  All plaintiffs except Arnold Roth are citizens of the United States and, therefore, fall within subsection (c)(1)'s ambit.  Arnold Roth, while not himself a United States national, is only before the Court in his capacity as legal representative of Malka Roth's estate.  Because Malka Roth is a United States national, Arnold Roth meets subsection (c)(4).

#### c. Standing of estate plaintiffs

Arnold and Frimet Roth seek to recover on behalf of Malka Roth as her personal representatives for injuries she suffered during life.  They must establish their standing before they may recover for harms suffered during Malka's life.  *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12 (D.D.C. 2011) (noting that "recovery for pain and suffering . . . is not universally available to estate-plaintiffs").  The determination of whether an estate may maintain a cause of action for injuries suffered during the decedent's life is a question "governed by the law of the state which also governs the creation of the estate." *Id.*  State law governs this issue

because it is not related to the extent and nature of the claims, but instead involves a threshold question regarding the "power of the estate to bring and maintain legal claims." *Id.*

Malka Roth's estate exists under Israeli law.  Pl.'s Supp. Mem. Ex. A, ECF No. 42-1 (Inheritance Order issued by an Israeli government official demonstrating that Malka Roth's estate exists in Israel).  Israeli statutory law provides that a deceased tort victim's right to recover for injuries suffered during life passes to his or her estate.  Civil Wrongs Ordinance (New Version) § 19, 5728-1968, 2 LSI (New Version) 5 (1972) as amended (Isr.).  The Inheritance Order submitted by plaintiffs demonstrates that Arnold and Frimet Roth are Malka's heirs under Israeli law.  Pl.'s Supp. Mem. Ex. A.  Thus, Arnold and Frimet have standing to pursue a survival action on behalf of Malka's estate.

### d. Capacity of Arnold and Frimet Roth to sue on behalf of Elisheva Roth

The Court also considers the propriety of Elisheva Roth's claims being brought "by and through Arnold and Frimet Roth as her Parents, Friends and Next of Kin."  Federal Rule of Civil Procedure 17(c)(2) states that a "minor or an incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem."  It does not appear that Elisheva has any duly appointed representative.  A next friend need not have any particular formal legal status; it is sufficient that the individual possess "an interest in the welfare" of the person to whom they relate and whose rights are being pursued in the cause of action.  *In re Air Crash Disaster Near Saigon, South Vietnam on April 4, 1975*, 476 F. Supp. 521, 525 (D.D.C. 1979) (internal citation omitted).  Arnold and Frimet Roth—parents of Elisheva and also plaintiffs seeking damages from defendants—qualify as persons with an interest in Elisheva's

welfare. *See id.* (finding a non-profit corporation qualified as next friend to initiate suit on behalf of a group of surviving orphans).[10]  Arnold and Frimet may sue as Elisheva's next friend.

### 2. Act

For the reasons stated in part III.A.1.*a*, the Court finds that the acts giving rise to this case are of the type for which a foreign state may be held liable under section 1605A(c).  Specifically, the evidence establishes that acts of extrajudicial killing were committed by members of Hamas and that defendants provided material support in furtherance of those acts.

### 3. Actor

Defendants may only be held liable under section 1605A(c) if the acts of extrajudicial killing were committed or the provision of material support made by defendants themselves or by their agents.  28 U.S.C. § 1605A(c).  The facts found by the Court show that MOIS was Iran's conduit for the provision of funding and training to Hamas and its membership.  Therefore, Iran itself is treated as having provided material support.  *See Roeder*, 333 F.3d at 234 (holding that the actions of a political subdivision of a foreign state are attributable to the foreign state itself because they are treated as legally the same under the FSIA).

### 4. Theory of recovery—causation and injury

The elements of causation and injury under section 1605A(c) require plaintiffs "to prove a theory of liability" which justifies holding the defendants culpable for the injuries that the plaintiffs have allegedly suffered.  *Valore*, 700 F. Supp. 2d at 73; *see also Rimkus*, 750 F. Supp. 2d at 175–76 ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such

---

[10] The Court further notes that, even if Arnold and Frimet Roth do not have capacity to sue on behalf of Elisheva, failure to comply with Rule 17 does not divest the Court of its jurisdiction.  *See Donnelly v. Parker*, 486 F.2d 402, 406–07 (D.C. Cir. 1973) (holding, with respect to Rule 17(c), that "[i]n no event is federal jurisdiction to entertain the cause diminished").  Defendants have waived their right to challenge capacity by their failure to appear.  *See Myers v. Manchester Ins. & Indem. Co.*, 572 F.2d 134, 134 (5th Cir. 1978) (per curiam) (holding that appellant waived its challenge to appellee's capacity by failing to raise the matter until the post-trial conference); *cf. RK Co. v. See*, 622 F.3d 846, 850 (7th Cir. 2010) (concluding that a rule 17(a) objection that a party is not the "real party in interest" is a defense subject to waiver).

recovery, generally through the lens of civil tort liability."). While section 1605A(c) requires courts to determine the substantive basis for liability arising under it, the court is not given the authority (or duty) to articulate "federal common law." *Valore*, 700 F. Supp. 2d at 76. Instead, because liability under section 1605A(c) is based on "statutory rights," federal judges are instructed to "find the relevant law, not to make it." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003). Thus, judges may not "fashion a complete body of law" in considering claims under section 1605A(c). *Id.* Based on the D.C. Circuit's guidance, district courts in this jurisdiction "rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions" to define the elements and scope of these theories of recovery. *Oveissi*, 879 F. Supp. 2d at 54 (quoting *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009)). Plaintiffs seek to recover economic damages arising from Malka's wrongful death, survival damages for her pain and suffering prior to death, and solatium damages for intentional infliction of emotional distress ("IIED"). The Court will consider each theory of recovery below.

 a. *Wrongful death*

Plaintiffs seek recovery for economic losses accruing to the estate of Malka Roth. This Court has previously determined that a decedent's heirs at law, through the decedent's estate, may bring a wrongful death action under section 1605A(c) "for economic losses which result from a decedent's premature death." *Valore*, 700 F. Supp. 2d at 78 (internal citation omitted). Where defendants are liable for a decedent's extrajudicial killing, as these defendants are, they may be held "liable for the economic damages caused to decedents' estates." *Id.* Plaintiffs have sufficiently proved the validity of their wrongful death theory of recovery against defendants.

### b. *Survival action for pain and suffering*

Plaintiffs seek damages for Malka Roth's pain and suffering between the moment of the bombing and her death. Thus, plaintiffs are seeking to recover by way of a survival claim on a battery theory. A survival claim is one "that could have been brought by the decedent, had he lived to bring it." *Valore*, 700 F. Supp. 2d at 77 (citing Restatement (Second) of Torts § 926). The recovery is limited, however, to harms suffered before death. Restatement (Second) of Torts § 926(a).

Liability for battery arises when defendant "acted 'intending to cause a harmful or offensive contact with . . . , or an imminent apprehension of such a contact' by, those attacked and (2) 'a harmful contact with' those attacked 'directly or indirectly result[ed].'" *Valore*, 700 F. Supp. 2d at 77 (alterations in original) (quoting Restatement (Second) of Torts § 13). The Court concludes that element one has been sufficiently proved, as "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." *Id.* The second element is also established because uncontroverted affidavits establish that Malka was killed by the bombing. Thus, she was met with a "harmful contact." Plaintiffs have stated a valid theory of recovery.

### c. *Intentional infliction of emotional distress*

Plaintiffs seek to recover solatium damages for defendants' intentional infliction of emotional distress. Relying principally on the Restatement (Second) of Torts, this Court has set out the following standard for recovery on a theory of IIED in section 1605A(c) cases: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results

from it, for such bodily harm." *Estate of Heiser*, 659 F. Supp. 2d at 26 (quoting Restatement (Second) of Torts § 46(1)).

An actor may also be liable for IIED to a party against whom the extreme and outrageous conduct was not directed if that party is (1) a member of the victim's immediate family and (2) was present at the time of the extreme and outrageous conduct. *See Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75 (D.D.C. 2010) (citing Restatement (Second) of Torts § 46(2)(a)). The "immediate family" requirement is strictly construed in FSIA cases; generally, only spouses, parents, siblings, and children are entitled to recover. *Id.* As to the issue of presence, this Court has previously held that one "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result." *Valore*, 700 F. Supp. 2d at 80. This is because terrorism is sufficiently extreme and outrageous to demonstrate that it is intended to inflict severe emotional harm on even those not present at the site of the act. *Id.*

The plaintiffs have stated a valid theory of recovery as to their IIED claims. As this Court has previously held, "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Murphy*, 740 F. Supp. 2d at 74 (quoting *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)). Uncontroverted affidavits submitted by plaintiffs demonstrate that such emotional distress did result. Also, the evidence establishes that "Iran intentionally provided material support to Hamas, and did so with the intent that Hamas would carry out attacks that would cause severe emotional distress." *Greenbaum*, 451 F. Supp. 2d at 104 (stating this conclusion in a case arising out of the same attack which underlies this suit). Finally, plaintiffs have proved the additional elements of an IIED claim applicable when the claim is based on actions directed against a third person. Each has established by uncontroverted affidavits that they are Malka Roth's immediate

family members. Furthermore, although the family member plaintiffs do not allege that they were present at the site of the attack, this requirement is not imposed when the extreme and outrageous conduct is a terrorist attack such as this.

### 5. Personal injury

For the reasons stated in part III.A.1.*a*, this suit is one for "person injury or death." This element of section 1605A(c)'s private right of action is also met.

### 6. Jurisdiction

For the reasons laid out above in part III.A.1, the Court "may maintain jurisdiction" over this suit. In light of plaintiffs' satisfaction of subsection (c)'s requirements, the Court concludes that defendants may be held liable to them on the basis of this statute.

### D. Liability Under Non-Federal Law

In Count II of their complaint, plaintiffs plead a wrongful death action arising under both section 1605A's private right of action and "state common law." Section 1605A(c) authorizes recovery for wrongful death, for the reasons set forth above. Plaintiffs can only have one recovery for their injuries, regardless of the number of theories upon which they base their complaint. *Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir. 1976) ("Where there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of parties whom or theories which the plaintiff pursues."). Because defendants are liable to plaintiffs under section 1605A(c) and because that subsection explicitly provides for the type of damages that plaintiffs seek in count II (upon sufficient proof of course), the Court will proceed only on the basis of the section 1605A(c) claims with respect to count II. *See Belkin*, 667 F. Supp. 2d at 22–23 (D.D.C. 2009) (declining to proceed on two counts of a complaint because, although the

complaint pled causes of action under District of Columbia and Israeli law, the requested damages were duplicative of a wrongful death count arising under section 1605A(c)).

### E.  Damages

Having established defendants' liability for plaintiffs' injuries, the Court proceeds to decide the amount of individual damages to which each plaintiff is entitled.

### 1.  Legal standard

Damages available under section 1605A's cause of action "include economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).  Accordingly, deceased plaintiffs' estates can recover economic losses stemming from wrongful death of the decedent; family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages.  *Valore*, 700 F. Supp. 2d at 83.  The estate of a deceased victim may also recover damages for pain and suffering if it can be proved that the decedent experienced pain and suffering prior to their death.  *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112 (D.D.C. 2000).  Finally, in appropriate cases, plaintiffs may recover prejudgment interest on their compensatory damages awards.  *Amduso v. Republic of Sudan*, ---F. Supp. 2d---, Civil Action No. 08-1361 (JDB), 2014 WL 3687126, at *7 (D.D.C. July 25, 2014).

"To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages."  *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003)) (internal quotation marks omitted).  As to the issue of a reasonable estimate of damages in cases brought under section 1605A, a court may consider

prior damage awards for pain and suffering and solatium as examples for determining an appropriate award for each plaintiff. *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).

### a. Pain and suffering

Assessing appropriate damages for pain and suffering can depend upon a myriad of factors, such as "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44, 46 (D.D.C. 2012) (internal citation and quotation marks omitted). Plaintiffs who were killed in the attack giving rise to the cause of action cannot receive an award for pain and suffering if their death was instantaneous. *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112 (D.D.C. 2000). Also, a court must refuse to award damages for pain and suffering if the plaintiff is unable to prove that the decedent consciously experienced the time between an attack and his or her death. *Estate of Botvin*, 873 F. Supp. 2d at 244.

### b. Economic loss

Economic loss damages can be recovered pursuant to section 1605A(c). Such damages may be proven by the submission of a forensic economist's expert report. *Belkin*, 667 F. Supp. 2d at 24. In considering an award for lost future earnings, the Court shall take account of the reasonableness and foundation of the assumptions relied upon by the expert. *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012). For example, in *Belkin*, the court awarded economic damages based on its conclusion that expert testimony before it was based on reasonable assumptions about the plaintiff's likely earnings if she had survived, including the

length of time she would have worked and received retirement benefits. *Belkin*, 667 F. Supp. 2d at 24.

### c. Solatium

Solatium under the FSIA is functionally identical to IIED. *Id.* It is a form of damages intended to compensate persons for "mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience . . . as well as the harm caused by the loss of the decedent's society and comfort." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011) (internal citation and quotation marks omitted). Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish. *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 30 (D.D.C. 1998) (discussing solatium damages under the prior version of the statutory state-sponsored terrorism exception to foreign sovereign immunity). As for siblings, testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages. *Id.*

This Court developed a standardized approach for evaluating IIED claims for solatium damages in *Estate of Heiser*, where it surveyed past awards to family members of victims of terrorism to determine that, based on averages, "[s]pouses typically receive greater damage awards than parents, who, in turn, typically receive greater awards than siblings." *Estate of Heiser*, 466 F. Supp. 2d at 269. Relying upon its evaluation of past average awards, the *Heiser* Court articulated a framework in which parents of deceased victims were awarded approximately $5 million and siblings received $2.5 million. *Id.*; *see also Valore*, 700 F. Supp. 2d at 85 (observing that this framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror).

In applying this framework, however, courts must be wary that "[t]hese numbers . . . are not set in stone," *Murphy*, 740 F. Supp. 2d at 79, and that deviations may be warranted when, for example, "evidence establish[es] an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant [is presented]; and circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26–27.

### d. Punitive damages

Punitive damages are explicitly made available under section 1605A's cause of action for the purpose of punishing and deterring foreign states from engaging in or materially supporting terrorism. *See Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 105 (D.D.C. 2012). Four factors are relevant in deciding the level of punitive damages appropriate in a given case: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Id.* (internal citation omitted). One additional factor is relevant: in situations where punitive damages have been awarded repeatedly against a defendant for the same conduct in a series of lawsuits, the Court should consider whether to limit such damages so as not to over-punish that defendant for that particular conduct. *See Murphy*, 740 F. Supp. 2d at 81. In cases where this factor has been salient, the Court has tied punitive damages to compensatory damages by applying a multiplier to the amount of compensatory damages awarded. *Id.* at 81–83.

As to the factors relating to the need for deterrence and the wealth of the defendants, this Court has repeatedly adopted a method for calculating an appropriate amount of damages based on the magnitude of the defendant's support for terrorism. The Court has generally considered

an estimate of the defendant state's annual expenditure in support of terrorist organizations and applied a multiplier to it, usually between three and five. *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 13 (D.D.C. 2011). This method is calibrated to produce an award that, while proportional to a defendant's acts, is large enough to have a deterrent effect on the foreign state. *Estate of Heiser*, 659 F. Supp. 2d at 30–31.[11]

### e. Prejudgment interest

Whether to award prejudgment interest is a matter committed to the discretion of the court, subject to equitable considerations. *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997). Prejudgment interest may be awarded on compensatory damages but there are limitations on when such awards are appropriate. First, prejudgment interest should not be added to economic loss damages when such awards are already discounted to present value because this would result in double counting of the interest multiplier. *Amduso*, 2014 WL 3687126 at *7. Also, this Court has consistently declined to award prejudgment interest on solatium damage awards calculated according to the *Heiser* framework outlined above. *Oveissi*, 879 F. Supp. 2d at 58–59. This is because the *Heiser* framework represents a calculation of the appropriate level of compensation, regardless of an attack's timing. *Id.*

### 2. Application

The Court begins by considering the threshold issue of whether defendants' actions were reasonably certain to cause the consequences complained of. All damages in this case spring

---

[11] This method of calculating punitive damages in section 1605A cases remains valid, despite recent Supreme Court precedent strengthening constitutional protections against large punitive damage awards, because "foreign sovereigns cannot use the constitutional constraints of the Fifth Amendment due process clause to shield themselves from large punitive damages awards." *Bodoff*, 907 F. Supp. 2d at 106. Furthermore, the Supreme Court's punitive damages jurisprudence in the field of maritime law—articulated in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008)—need not and should not be extended to change the method for calculating punitive damages in FSIA cases. *See Beer v. Islamic Republic of Iran*, 789 F. Supp. 2d 14, 22–26 (D.D.C. 2011) (extensively discussing the issue and providing three independent reasons for not extending the Supreme Court's *Exxon* decision to cover section 1605A suits).

from Malka Roth's death and the pain and suffering her family experienced as a result.   Such consequences were "reasonably certain" to occur as a result of defendants' material support of Hamas' terrorist activities.   Indeed, expert testimony indicates that this fact was clear even to Iran.   *Cf. Greenbaum*, 451 F. Supp. 2d at 104 (quoting a passage from Dr. Clawson's deposition in that case where he stated his view that Iran "has no doubt that many of those killed [in terrorist attacks] are, in fact, children and other civilians and that the relatives and friends of those killed . . . suffer psychological damage as a result").   Therefore, the Court will next evaluate each plaintiff's entitlement to an award and the appropriate amount.

### a.  Estate of Malka Roth

The estate of Malka Roth seeks damages (1) for her pain and suffering before death and (2) for economic losses accruing to her estate.   As to the estate's survival claim, no evidence has been submitted that Malka was conscious for any period of time between the bombing and her death.   In light of this fact, the Court is constrained to conclude that it cannot award her estate any damages for pain and suffering for the period between the bombing and her death.

In support of the request for economic loss damages, plaintiffs have submitted the expert report of Chad Staller and James Markham, President and Senior Economist respectively at the Center for Forensic Economic Studies.   Pl.'s Mot. Def. J. and Damages Mem. Ex. D, ECF No. 34-5.   Using reasonable assumptions and reliable calculations—based on economic models and government data—the report gives a range of potential economic loss damage awards.   These awards differ based on three factors: whether Malka would have obtained a bachelor's or graduate degree, whether she would have worked until the ages of 60 or 65, and whether she would have spent her life working entirely in the United States.

The Court shall briefly discuss the application of the three factors above to determine what economic loss award would be appropriate.  First, it is not reasonable to believe that Malka would have spent her entire life working in the United States, despite her dual citizenship in this country, because she had spent most of her life prior to death in Israel and her parents and siblings all continue to reside there as well.  Arnold Roth Decl. ¶¶ 6, 24 (stating that Malka was born only two years before the family moved to Israel and that all members of the family continue to reside there).  Thus, the Court will disregard the range of loss estimates that are based on a worklife spent entirely in the United States.  Second, it is reasonable to assume that Malka would have obtained a graduate degree given the high level of academic achievement in her family.  *Id.* ¶ 25 (recounting that all members of the family old enough to have done so are either members of the medical or legal professions or have completed or are in the process of completing graduate education).  Finally, the Court shall assume that Malka's worklife would have been to the age of 65, based on Staller and Markham's worklife calculation according to a model published in a peer-reviewed forensic economics journal.  Pl.'s Mot. Def. J. and Damages Mem. Ex. D at 2.  Given these assumptions, the Court concludes that the estate of Malka Roth shall receive an economic loss damages award of $1,191,019.

### b. Family of Malka Chana Roth

The following members of Malka Roth's family seek solatium damages for IIED: her mother Frimet and her siblings Elisheva, Pesia, Rivka, Zvi, Shaya, and Pinchas.  After careful evaluation of plaintiffs' evidence, the Court concludes that each member of Malka Roth's family, except for Elisheva Roth, has sufficiently demonstrated the sort of personal connection with Malka and mental anguish resulting from her death to support an award of solatium damages.  On the other hand, the Court concludes that it shall not make an upward or downward

departure from the normal solatium framework applied in state-sponsored terrorism cases.  The evidence presented regarding the circumstances of this attack, including the relationships each family member had with Malka, do not demonstrate an unusual degree of mental anguish that would warrant an increased or decreased damages award.

The matter of Elisheva Roth warrants further discussion.  Elisheva, as discussed above, is blind and suffers from a profound intellectual disability.  She is only able to communicate by signaling yes or no through subtle movements of her index finger.  Thus, it is impossible through direct testimonial evidence to determine the extent to which she has suffered mental anguish as a result of Malka's death.  Furthermore, plaintiffs have not submitted any circumstantial evidence of Elisheva's reaction that might indicate that she felt a close personal relationship with Malka or suffered mental anguish as a result of Malka's death.  While such an outcome is deeply regrettable, the Court must deny an award of solatium damages to Elisheva Roth for lack of evidence.  Lines must be drawn in the award of this form of damages and one such line includes a situation like this, where *no* evidence is offered to show injury that an award of solatium damages might compensate.

Therefore, the Court concludes that Frimet Roth shall receive $5 million and five of Malka's siblings—Pesia, Rivka, Zvi, Shaya, and Pinchas—shall each receive $2.5 million in solatium damages.  Elisheva Roth's claim is dismissed.

### c. Punitive damages

Analysis of the four factors relevant to an award of punitive damages shows that a substantial award of punitive damages is justified in this case.  Regarding the first factor—the character of the defendants' acts—defendants' material support for Hamas' terrorist activities is truly awful and worthy of the gravest condemnation.  The second factor also points to a

substantial award; the harm caused by defendants' support is among the worst imaginable—the death of an innocent child and the emotional devastation of her family.  Furthermore, the Court has never before awarded punitive damages in a case arising out of this incident.  *See Greenbaum*, 451 F. Supp. 2d at 105 (refusing to award punitive damages because suit was brought under the prior version of the state-sponsored terrorism exception to foreign sovereign immunity, which did not allow for punitive damage awards against foreign states).  Thus, there is no need to reduce the level of punitive damages in light of prior awards.

As set forth above, the proper level of punitive damages is based on a multiplied estimate of Iran's annual expenditures in support of terrorist activities.  Plaintiffs urge the Court to take judicial notice of evidence in prior cases indicating that Iran provided between $25 million and $50 million in annual material support to Hamas during the 1990s.  Pl.'s Mot. Def. J. and Damages Mem. 15; *Estate of Botvin*, 873 F. Supp. 2d at 238 (recounting expert testimony from a CIA case officer that Iran provided $30 million per year to Hamas in the early-to-mid 1990s and testimony from Dr. Clawson that the support was equivalent to $25 million to $50 million per year in cash and material support).  The Court shall take notice of this evidence in this case.  As it has done previously when faced with a range-based estimate of terrorism expenditures, the Court shall adopt the mid-point of the proposed range, $37.5 million, in calculating punitive damages.  *See, e.g.*, *Estate of Heiser*, 659 F. Supp. 2d at 30.

Plaintiffs argue that the Court should adopt a multiplier between three and ten with ten being their preferred level.  The Court concludes, based on an analysis of prior cases of this type, that a multiplier of three is appropriate; plaintiffs have not offered a persuasive reason to depart from the usual practice in state sponsored terrorism cases.  *See, e.g.*, *Beer v. Islamic Republic of Iran*, 789 F. Supp. 2d 14, 26 (D.D.C. 2011).  Therefore, the plaintiffs are entitled to a punitive

damages award of $112.5 million, to be apportioned according to each plaintiff's share of compensatory damages.[12]

### d. Prejudgment interest

Plaintiffs have requested prejudgment interest.  The Court concludes, however, that it cannot award such interest.  First, the economic loss damages awarded to the estate of Malka Roth have already been discounted to present value.  Pl.'s Mot. Def. J. and Damages Mem. Ex. D at 3.  Second, the Court does not award prejudgment interest on solatium damage awards that are based on the *Heiser* framework.  These rules encompass every type of compensatory damages the Court is awarding in this case.

## V.  CONCLUSION

For the foregoing reasons, the Court finds that defendants Iran and MOIS are jointly and severally liable for the death of Malka Roth and injuries to her family.  It awards plaintiffs $18,691,019 in compensatory damages and $112,500,000 in punitive damages, in the proportions set forth in the Order and Judgment accompanying this opinion, issued this date.

Signed by Royce C. Lamberth, United States District Judge, on January 27, 2015.

---

[12] This sum is less than the punitive damages awarded in many other state-sponsored terrorism cases that also adopted the terrorism expenditure-multiplier method.  Nonetheless, the Court declines to take notice of evidence that the plaintiffs have not urged it to consider.  Also, this award is sufficient to achieve the policy objectives of punitive damages in section 1605A cases.  For example, it is of a similar magnitude to the punitive damages of $150 million per victim awarded in *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008).